## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph H. Rodriguez |
| | : | |
| v. | : | Crim No. 06-867 (JHR) |
| | : | |
| KASIEM BROWN, a/k/a "KING" | : | **Opinion** |

This matter comes before the court on Defendant Kasiem Brown's pre-trial motion to suppress the firearms seized on January 30, 2006. Defendant contends that the police lacked the requisite reasonable suspicion to stop his vehicle. For the reasons expressed below, Defendant's motion is granted.

### I. Factual and Procedural Background

On January 30, 2006, officers of the Atlantic City Police Department received reports of gunfire at 4:00 a.m. near the Sands Casino Hotel ("the Sands"). (See Def.'s Ex. 8.) Officers were immediately dispatched to the intersection of Indiana and Pacific Avenues. (Id.) Witnesses at the scene told police that an SUV "had been the target of gunshots fired by unknown persons". (See Gov't. Opp'n Br., p.15.) A radio transmission at 4:02:56 a.m. described the suspected vehicle as a black Chevrolet Suburban (SUV) with four to five black males inside.[1] (See Def.'s Reply Br., Attach. 2, p.44.) The Suburban's rear-tinted window was reported as having been shot-out. (Id. at Attach. 1, 16.) Consistent with that report, responding Officer Petinga reported shards of "tinted and clear glass from vehicle windows" laying "in the middle of the street" at the scene of

---

[1] Other reports from witnesses concluded the same– a black Chevrolet Suburban was spotted at the scene. (See Def.'s Reply Br., Attach. 1, p.46.)

1

the shooting. (Def.'s Ex. 8.) An eye-witness indicated that the SUV had driven away "southbound at a high rate of speed". (Id.)

Upon hearing reports from dispatch, Officers Barrett and Wagner responded. Traveling in a marked car, they arrived at Indiana and Pacific Avenues within minutes. (See Def.'s Reply Br., Attach. 1, p.17.) Officer Barrett described the area as being "very well lit." (Id. at 5.) While conducting a search of the surrounding blocks, the officers received reports that an SUV, similar to the one described in the initial report, was spotted on the Atlantic City Expressway. (See Barrett Test. Tr. p. 18.) That radio report was transmitted to the officers at 4:04:33 a.m. (Id.)

Four minutes after receiving that transmission– approximately nine minutes after the initial report of gun fire– Officer Barrett and Officer Wagner spot a dark-blue Chevrolet Tahoe idling three blocks from the scene of the shooting at a red light. (Id. at 16 , 22; and Gov't. Ex. C.) The Tahoe was headed westbound at Arkansas and Pacific Avenues, while the officers were traveling eastbound. (See Def.'s Reply Br., Attach. 1, p.23.) Detective Barrett observed three individuals in the Tahoe, two of whom were discernibly black males. (Id. at Attach. 2, 45.) As the officers drove past the Tahoe, the driver turned his head. (See Gov't. Ex. C.) The officers then made a quick u-turn to get behind the vehicle. (Id.) Detective Barrett observed the driver through the tinted windows handing an indescript object to the passenger in the rear seat. (Id.) At that point, the officers activated their emergency lights and sirens in order to perform an investigatory stop. (Id.)

Next, Officer Barrett immediately approached the Tahoe with his flashlight in hand. (See Def.'s Reply Br., Attach. 1 at 9.) He positioned himself "towards the rear of

the passenger's side" of the Tahoe. (Id.) From that vantage point, Detective Barrett shined his flashlight into the vehicle, and saw the muzzle of a firearm protruding from an open compartment in plain view. (Id. at 10.) A second firearm was later discovered after a thorough search of the vehicle. (Gov't Surreply Br., p.2.)

Defendant Brown and the driver, Ibn Shabazz, were arrested and charged with unlawful possession of two firearms in the Superior Court of Atlantic County, New Jersey, Criminal Division. (Id.) Both Defendants filed motions to suppress the seizure, contending the police lacked the requisite reasonable suspicion to stop the vehicle. (Id.) After briefing and a suppression hearing, the state superior court judge ruled that the officers had reasonable suspicion to stop the vehicle. (Id. at 6.) The state dismissed the charges against Defendant Brown on May 29, 2007, however, following a superseding indictment issued by a federal grand jury on May 22, 2007. (Id.) Now in federal district court, Defendant Brown is charged, *inter alia*, with unlawful possession of firearms in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Defendant has once again moved to suppress the firearms seized on January 30, 2006. Both the Government and Defendant have submitted briefings, and testimonial hearings have been held. This Court has jurisdiction pursuant to 18 U.S.C. § 3231.

## II. Discussion

The Fourth Amendment ensures "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. For a seizure to be constitutionally reasonable, "it must be effectuated with a warrant based on probable cause." See United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (quoting United States v. Robertson, 305 F.3d 164, 167 (3d

Cir. 2002).  One exception to the warrant requirement, *inter alia*, occurs when an officer conducts a brief investigatory stop based on articulable, reasonable suspicion that "criminal activity is afoot."  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (discussing the exception known as the "Terry stop", established in Terry v. Ohio, 392 U.S. 1 (1968)).  A Terry stop may occur either before or after a crime has allegedly been committed.  See Brown, 448 F.3d at 244, n.7. (citing United States v. Hensley, 469 U.S. 221, 229 (1985)).

When the police stop an automobile and detain its occupants, they have effected a seizure within the scope and meaning of the Fourth Amendment.  See Delaware v. Prouse, 440 U.S. 648, 653 (1979).  In the context of a Terry stop then, such stops are permitted without a warrant when the officer has articulable, reasonable suspicion that either the vehicle or its occupant has violated the law.  Id. at 663.  If no articulable, reasonable suspicion exists for the stop, then any evidence seized pursuant to the stop must be suppressed as "fruit of the poisonous tree."  See United States v. Mosley, 454 F.3d 249, 269 (3d Cir. 2006) (citing Wong Sun v. United States, 371 U.S. 471, (1963)).

Here, the central issue is whether Detective Barrett had reasonable suspicion to stop the vehicle in which Defendant Brown was a passenger.  If he did not, then the firearm seen in plain view, along with the second one later discovered, must be suppressed as fruit of an unlawful seizure.  The Government has the burden to show a "minimal level of objective justification" for the stop.  See United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006).  Pointedly, there is no dispute that a seizure occurred, nor is the timing of the seizure at issue.[2]

---

[2] The Government does not dispute that the seizure took place when the overhead lights and siren were activated, immediately after Shabazz was observed handing an object to the

**A. Reasonable Suspicion Standard**

The Supreme Court recognizes that the reasonable suspicion standard is abstract and elusive. See United States v. Arvizu, 534 U.S. 266, 274 (2002) (describing the standard as "abstract") and United States v. Cortez, 449 U.S. 411, 417 (1981) (describing the standard as "elusive"). The test to determine whether articulable, reasonable suspicion exists is an objective one, judged by factors known to the officers *before* the investigatory stop is made. See United States v. Valentine, 232 F.3d 350, 358 (3d Cir. 2000) (citing Florida v. J.L., 529 U.S. 266, 271 (2000)) (emphasis added). Courts must examine the totality of the circumstances to determine whether the requisite "particularized suspicion" is present. United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002). In conducting the totality of the circumstances test, each factor cannot be judged in isolation. See Arvizu, 534 U.S. at 274 (holding that Terry "precludes ... divide and conquer analysis"). Such analysis is precluded because each factor may seem innocent in isolation, but when viewed collectively creates sufficient reasonable suspicion for "further investigation." Terry, 392 U.S. at 22.

**B. Applicable Precedent**

Relevant case law points to several factors that aid in the determination of reasonable suspicion. For example,

> The Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences (*United States v. Cortez*), personal observation of suspicious behavior (*Terry v. Ohio*), information from sources that have proven to be reliable, and information from sources that– while unknown to the police– prove by the accuracy and intimacy of the

---

passenger in the rear seat of the Tahoe. (See Gov't Opp'n Br., p.16, n.7.)

information provided to be reliable at least as to the details contained within that tip (*Alabama v. White*).

Brown, 448 F.3d at 247 (quoting Nelson, 284 F.3d at 478).

Anonymous tips and eye witness reports often form the basis for reasonable suspicion. In United States v. Nelson, the Third Circuit held that the tips communicated to police possessed sufficient indicia of reliability to justify an officer's Terry stop of an automobile. 284 F.3d at 482. There, police were looking for persons suspected of committing "armed hold-ups of drug dealers." Nelson, 284 F.3d at 475. The information conveyed was that "two black males ... were driving in a gray BMW with tags in the rear window ... on Martin Luther King Drive." Id. A second tip provided the same description. Id. When the police arrived at Martin Luther King Drive, they found two black males driving in a gray BMW with tags in the rear window–a precise match.[3] Id. at 481. The question in that case ultimately turned on the reliability of the tips, as there was no independent basis for the stop other than the precise match of the tips. Id. Because the initial caller had a previous relationship with the police, and because both calls not only matched, but also described ongoing criminal activity, the Third Circuit held that a sufficient basis existed for the stop. Id. at 482-83.

In another case, police received reports that three armed robberies had just

---

[3]The Third Circuit stated in pertinent part:

[G]iven the reasonable suspicion that the individuals in the car had committed the crimes reported, based on the exact match of the unique description– *car, plates, occupants and direction of travel*– no additional suspicious conduct was required to justify the stop.

Nelson, 284 F.3d at 481, n.5 (emphasis added).

6

occurred in neighboring towns.[4] United States v. Kithcart, 134 F.3d 529, 530 (3d Cir. 1998). Radio transmissions described "two black males in a black sports car ... possible Z-28, possible Camaro", with one of the suspects possibly wearing white clothes. Id. Ten minutes after receiving the last radio transmission, an officer spotted a black Nissan 300ZX driven by a black male headed south on a road roughly one mile from the border of Bristol Township. The driver appeared to be the only person in the car. Id. at 531. The officer then "pulled up behind the vehicle, which had stopped at a red light." Id. After noticing the officer, the driver of the Nissan drove through the red light, which caused the officer to initiate a stop. Id. When two sets of arms raised up, the officer ascertained that two people were inside the car. Id. She then called for backup, and did not exit her patrol car until other officers arrived. Id. Two guns were ultimately found– one in a white-nylon waist pouch on the driver and the second under the driver's seat. Id.

     The defendant moved to suppress, contending that the officer lacked reasonable suspicion to stop and detain in the first place. Id. Not addressing the reasonable suspicion argument, the district court ruled that the officer had *probable cause* to make the stop, independent of the running of the red light.[5] Id. (emphasis added). The Third Circuit reversed, noting that the match between the information transmitted and the car stopped by the officer was "far from precise." Id. at 531. Then-Circuit Judge Alito wrote:

---

[4]Specifically, the first two robberies had taken place in Bensalem Township, while the third occurred in Bristol Township. Kithcart, *supra*, at 529.

[5]The running of the red light was disputed in that case. Id.

> [A]rmed with information that two black males driving a black sports car were believed to have committed three robberies in the area some relatively short time earlier, Officer Nelson could not justifiably arrest any African-American man who happened to drive by in any type of black sports car.

Kithcart, 134 F.3d at 532.

Also noteworthy is the fact that the record was devoid of evidence that a Z28 could easily be mistaken for a 300ZX.[6]  Id. at 531.  The Third Circuit then remanded on the issue of whether the facts above support a finding for reasonable suspicion.  Id. at 532.

Tellingly, Judge McKee wrote a separate opinion.  See generally, Kithcart, 134 F.3d at 522-536 (McKee, J., concurring in part and dissenting in part).  While Judge McKee agreed that the officers did not have probable cause to make the stop, he strongly disagreed with the decision to remand on the question of reasonable suspicion; "Officer Nelson did not have reasonable suspicion to stop and detain the occupants of the car." Id. at 532.  In support of this conclusion, Judge McKee reasoned that:

> The car that Officer Nelson stopped was not only a different make and model than the one most likely involved with the armed robberies, but the number of occupants it contained appeared to be inconsistent with the radio broadcast as well.  The majority points out that it was only after Officer Nelson initiated the stop and saw a second pair of hands go into the air that she realized that the car did in fact contain two males.

Id. at 533.

Thus, in addition to the visible discrepancies, Judge McKee noted that the second pair of hands could not be included in the reasonable suspicion calculus because they were seen after the stop, and perforce after the officer had decided she had sufficient bases for the stop.

---

[6] The Court did, however, recognize both cars are considered "sports cars".  Id. at 531.

8

With respect to the different number of occupants, Judge McKee assailed the district court's reliance on the officer's inference that maybe the two "had split up" since the armed robbery. Id. at 533. He reasoned that

> unsupported conjecture of this type would allow a stop of a car containing any number of black males as one could always speculate that the car stopped and perpetrators got in or out of the car.

Id. at 533. Although Judge McKee's opinion is not binding on this court, his analysis is entitled some deference as it sheds light on the case presently before the Court. See infra Part II.C.

Finally, the Supreme Court opined in Illinois v. Wardlow that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." 528 U.S. 119, 124 (2000). The defendant in that case was spotted in a high crime area holding an "opaque bag". Id. at 121-22. Upon seeing police officers pass by in a four-car caravan, the defendant immediately fled. Id. at 122. The Supreme Court stated: "Headlong flight–wherever it occurs–is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. Id. at 124.

### C. Analysis

In accordance with the framework and precedent discussed above, the totality of the circumstances surrounding Defendant Brown's stop must now be examined. Officers Barrett Wagner relied on two principle factors justifying the stop: (1) the information transmitted via police radio reports and (2) independent observations of activity inside the Chevrolet Tahoe. Each factor shall be discussed in turn.

**1. The Police Radio Reports**

Any tip that forms the basis of a Terry stop must possess sufficient indicia of reliability so as to justify the stop. See United States v. Hensley, 469 U.S. 221, 233 (1985) (holding that if police make a Terry stop based on a "flyer or bulletin", then any evidence discovered during that stop "is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion" to justify the stop). Here, the officers justified the stop based on information independent of the police reports. Therefore, an exhaustive examination of tip reliability is not required. See e.g. Rogers v. Powell, 120 F.3d 446, 453 (3d Cir. 1997) ("The legality of a seizure *based solely on statements issued by fellow officers* depends on whether the officers who issued the statements possessed the requisite basis to seize the suspect.") (alteration to original) (emphasis added). Nevertheless, this Court shall not overlook the fact that information gleaned from the police reports formed a substantial basis for the officers conducting further investigation of the Tahoe. Therefore, the tips shall be examined to determine whether they possessed sufficient indicia of reliability so as to justify, in part, the Terry stop in this case.

The original tip received in this case occurred at approximately 4:00 a.m. on January 30, 2006, when the Atlantic City Police Department received information from a 911 call describing a shooting by the Sands at Indiana and Pacific Avenues. (See Gov't Opp'n Br., p.2.) Officer Petinga arrived at the scene of the shooting and met with an eye-witness who identified herself as Louis A. Evans. Id. Speaking face to face with the officers, the witness described a black Chevrolet Suburban with four to five black male occupants as involved in the shooting. (Id.) The vehicle was seen fleeing southbound at a high rate of speed. (Def.'s Ex. 8.)

In light of the circumstances taken as a whole, this tip possesses the requisite indicia of reliability so as to justify further investigation. First, an eye-witness tip carries significant weight. See Illinois v. Gates, 462 U.S. 213, 234 (1983). This rule is especially true in this case, considering that Officer Barrett described the scene as "very well lit" at the time of the shooting. (See Def.'s Reply Br., Attach. 1, p.5.) Thus, notwithstanding the fact that the shooting occurred at approximately 4:00 a.m., the vision of the witness was relatively unimpaired due to the bright casino lights in the area. (Id.) Furthermore, Officer Barrett confirmed in his supplemental report, (Gov't. Ex. C), and in testimony at the state proceeding, (Def.'s Reply Br., Attach. 2, p.46.), that "numerous calls" identified a black Suburban SUV as involved in the shooting. While not alone dispositive, these confirmatory calls lend credence to Evans' report. See Nelson, 284 F.3d at 483 (stating that the second tip confirmed information from the first tip).

Predictive information is another important indicator of reliability. See Brown, 448 F.3d at 250. Here, a tip indicated that the rear tinted window of the SUV was shot out. (Def.'s Reply Br., Attach. 2, p.44.) While it is not clear from whom this tip came, it was transmitted via police radio dispatch at 4:03 a.m. (See Gov't Surreply Br., Ex. A, p.18.) When Officer Petinga arrived at the scene, he discovered shards of tinted and clear glass in the middle of the street. (Def.'s Ex. 8.) This discovery bolsters the accuracy of the tip describing the rear tinted window, and also demonstrates a level of particularity that warrants further investigation. Moreover, the tip is consistent with the narrative provided by eye-witness Evans, who told Officer Petinga that the black SUV was the target of the shooting. (Def.'s Ex. 8.) As stated recently by the Third Circuit,

"[p]redictive information is ... useful in that it 'can reflect particularized knowledge'" Id. (quoting Nelson, 284 F.3d at 484).

A key problem in this case is that the information conveyed by the tips and radio reports does not square with the initial observations of Officers Barrett and Wagner. Again, the various reports described a black Suburban with four to five black males inside, rear window shot out, fleeing the scene southbound.  By contrast, Officers Barrett and Wagner discovered a dark-blue Tahoe with two discernible black males—plus a third person whose sex is indiscernible—with no rear tinted window shot out, headed westbound.  This situation is quite different from the facts of Nelson, where the observed "car, plates, occupants and direction of travel" were a precise match with the dispatch report.  See Nelson, 284 F.3d at 481, n.5.  Here, the car, occupants and direction of travel do not match.  The multiple discrepancies between the reports and the officer's observations indicate that either the reports were unreliable or with due respect, the officers missed the mark.

The Government contends a compromise position.  Notwithstanding the several reports indicating a black Chevrolet Suburban, the Government suggests there is strong commonality between the vehicle reported and the vehicle discovered at the red light; both are dark-colored SUVs made by Chevrolet.  (See Gov't Opp'n Br., p.2.)  Moreover, the Government cites an additional eye-witness tip by Matthew Cunningham, a valet who works at the Sands, to suggest that the blue Tahoe was the correct vehicle after all. (Gov't Ex. B.)  As Officer Petinga reports:

> Cunningham ... flagged myself down and advised me there was a blue in color Chevy SUV that was suspicious and in the area numerous times during the night circling the area. *As I gave this information out Officer*

12

> *Leon advised myself that they had a vehicle fitting that description stopped at Georgia and Pacific Ave. where there were two weapons recovered.* I than [sic] transported Cunningham to the scene where he made positive identification on the vehicle as being in the area at the time of the shooting.

(Id.) (emphasis added).

If Cunningham's report was communicated to Officers Barrett Wagner prior to stopping the Tahoe, then the reasonable suspicion calculus might be different. But that is not the case here. By the time Officer Petinga transmitted the report of Cunningham, the officers had already seized the vehicle. (Id.) As stated above, the test to determine whether reasonable suspicion exists is judged by factors known to the officers *before* the stop is made. Valentine, 232 F.3d at 358. Because this information was not conveyed until *after* stop was made, it is irrelevant as to whether the officers had sufficient suspicion to stop the vehicle in the first place. As a result, the Court is left in the same position as the officers on that January night—needing something more.

With respect to the commonality between a Chevrolet Suburban and a Chevrolet Tahoe, Officer Barrett testified on redirect at the suppression hearing that "[t]he Suburban is just a larger form of a Tahoe…" (See Barrett Test. Tr., p.27.) A short colloquy continued:

    Q. Does it have more doors?
    A. It's, I believe just longer in body length.
    Q. Is it wider, as well?
    A. It may be.

(Id.)

Keeping these distinctions in mind, Officer Barrett testified at the state suppression hearing that he could possibly confuse a Suburban for a Tahoe. (See Gov't Surreply Br.,

Ex. A, p.52.)  Thus, unlike in Kithcart, there is testimony here which indicates a person could mistake a Suburban for a Tahoe, and *vice versa*.  The potential confusion is belied by the distinction in colors, however.  Whereas in Kithcart both vehicles were black, here, the reported vehicle was black and the vehicle stopped was dark-blue.  To be sure, the officer's testimony demonstrates some latitude as to whether they were looking for a *dark* suburban or a *black* suburban.  (Gov't Surreply Br., Ex. A, p.18.)  The inference is that, just as a Suburban could be mistaken for a Tahoe, so too could dark-blue be mistaken for black.  To this point, it must be underscored that Officer Barrett described the scene of the shooting as "very well lit".  (See Def.'s Reply Br., Attach. 1, p.17.)  Notwithstanding the time of day then, the strong casino lighting in this case provided the witnesses with sufficient visibility to determine whether the vehicle was in fact blue or black.  Additionally, the police transmission plainly states–

> Q.  It says a black suburban and then it says four or five BMS.  Is that black males?
> A.  I believe.  Yes.
> Q.  Okay.  And then down a little further, it looks like around 4:03, call from 49.  A 49 is a witness, correct?
> A.  Yes.
> Q.  Okay.  The window–Possibly rear-tinted window was shot out.
> A.  Okay.
> Q.  Now would that be broadcast over your radio?
> A.  Yes.

(Id. at 21.)

Thus, not only was it clear that a black Suburban was the reported vehicle, it was also clear that the vehicle had four to five black males inside with possibly the rear-tinted window shot out.  These two additional factors undercut the potential confusion between the vehicle reported and the vehicle stopped.  As stated by the Third Circuit,

"[a]n officer cannot conduct a Terry stop simply because criminal activity is afoot." See United States v. Brown, 159 F.3d 147, 149 (3d Cir. 1998) (citing Terry, 392 U.S. at 29). Therefore, because there are several mismatches between the descriptions of the occupants, the vehicle, and the direction of the vehicle, additional suspicious conduct is needed for a finding of reasonable suspicion. See Nelson, *supra*, at 481, n.5.

### 2. Independent Observations

Independent of the specific tips transmitted via police radio report, there are several key observations that predicated the seizure. First and foremost, Officer Barrett observed the driver, Ibn Shabazz, turn his head when he drove past the Tahoe. Officer Barrett testified at the state proceeding that "[i]t raised our suspicions." (See Gov't Surreply Br., Ex. A, p.27.) The Government characterizes the head turn as "conscious avoidance of the police" which supports a finding of reasonable suspicion. (See Gov't Opp'n Br., p.16.) Citing a string of cases, the Government contends that the head movement in this case is not inapposite from the following actions which supported a finding of reasonable suspicion: Valentine, 232 F.3d at 357 (noting that three men began walking away as soon as a patrol car arrived); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (noting that the defendant turned his back and walked away as soon as officers approached); and United States v. Peterson, 100 F.3d 7, 11 (2d Cir. 1996) (noting that three men began "ducking out of sight" when they first saw police officers). This Court disagrees; the head movement in this case is inapposite with the nervous, evasive behavior cited in the aforementioned cases. While it is one thing to turn around and walk away, it is another thing to turn one's head "a couple of seconds" while driving. (See Gov't Surreply Br., Ex. A, p.29.) Even the Second Circuit case is distinguishable, as

the suspects in that case "duck[ed] out of sight" in concert while on foot in a high crime area. Id. Here, one person turned his head while he was driving. The cross-examination of Officer Barrett is especially telling:

> Q. Well, with respect to the driver, you indicate that the driver turned away as to hide his identity from you?
> A. Yes. It–
> Q. What– what did he do specifically?
> A. He looked over at us, quickly turned away, you know, turned facing the other– the other way. Would not turn around. We– I mean we were– we were next to him for I would say maybe a couple of seconds. Wouldn't look back towards our direction.
> Q. Did you roll down your window and try to get his attention?
> A. No, I didn't.
> Q. Is it possible that he was talking to somebody in that vehicle?
> A. Could be.
> Q. Just didn't want to look at you guys? There's no reason for–
> A. I'm not– I'm not a mind reader. I don't know what he was thinking, but–
> Q. Okay. Is– So that was the suspicion right there what he did, --
> A. No.
> Q. –the fact that he wouldn't make eye contact with you?
> A. No, because we didn't immediately stop the vehicle.

(Id. at 28-29.)

Thus, Officer Barrett admits that the head turn did not form the sole basis justifying the seizure. The head turn did, however, arouse enough suspicion so as to cause the officers to make a u-turn and pull-up behind the Tahoe. (Id. at 29.)

Once behind the Tahoe, Officer Barrett observed a second factor relevant to the reasonable suspicion calculus; the driver handed an indescript object to the passenger in the rear seat. The Government describes this act as an "obvious attempt[] at concealment". (Gov't Opp'n Br., p.16.) As stated by the Third Circuit, if "[a] suspect behaves in a way that conforms to police officer's specialized knowledge of criminal activity", then such behavior may "corroborate an otherwise insufficient tip." Brown,

448 F.3d at 251.  The Government must rely on the officers' experience and specialized knowledge in this instance, because, at first blush, handing something to a rear passenger while driving is hardly indicative that "criminal activity is afoot."  See Terry, 392 U.S. at 90.

That being said, when judging the totality of the circumstances, this Court must examine "the whole picture".  See United States v. Cortez, 449 U.S. 411, 417 (1981).  Here, there are two additional factors to consider– the time of day and geographic proximity of the vehicle to the scene of the crime.  Both factors are relevant to the reasonable suspicion calculus.  See United States v. Goodrich, 450 F.3d 552, 562 (3d Cir. 2006).  It is undisputed that the seizure of the Tahoe occurred at 4:08:54 a.m.  (See Barrett Test. Tr., p.18.)  According to relevant case law, the late-hour presence of the vehicle on the street seemingly "supports the inference of criminal activity."  See Goodrich, 450 F.3d at 562.  With respect to geographic proximity, the Tahoe was found a mere three blocks away from the scene of the crime.  This factor also seemingly supports the inference of criminal activity.  Id.  Yet, it is important to judge each case by its own facts and context.  The Supreme Court opines that "the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multi-faceted, [so] one determination will seldom be a useful precedent for another."  Ornelas v. United States, 517 U.S. 690, 698 (1996) (citing Gates 462 U.S. at 233, n.11) (internal quotations omitted) (alteration to original).

While the facts indicate a late hour and close geographical presence, the facts also indicate that the vehicle fled the scene at a high rate of speed.  If the vehicle transporting Defendant Brown was the vehicle that fled the scene, then the inference is that it

traveled a mere three blocks in nine minutes, and then diligently waited for a traffic light to change green.  In a different case, the fact that the vehicle was close to the scene of the crime when discovered may point to reasonable suspicion.  In this case, however, it points away from it.  While this Court does not pretend to know the get-away routes of suspected criminals, the situation here runs contrary to commonsense.  Cf. Illinois v. Wardlow, 528 U.S. 119, 125 (2000) ("[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.").  In light of the fact that a second radio dispatch, transmitted at 4:04:33 a.m., described an SUV similar to the one in the initial report traveling on the Atlantic City Expressway, there is doubt as to the reasonableness of this stop.  (See Barrett, Test. Tr. p.18.)  Furthermore, if this Court were to countenance driving in Atlantic City–whose slogan is "Always Turned On"–at 4:00 a.m. as suspicious behavior, then many a person might be suspected of criminal activity.  See Atlantic City, New Jersey Home Page, *available at* http://www.atlanticcitynj.com (last visited, Oct. 20, 2008).

Ultimately, the Court is essentially left with a loosely fitting match of the vehicles, a head turn by the driver that lasted a "couple of seconds", and a hand-off of some indescript object by the driver to the passenger in the rear seat.  Despite giving the officers' experience and specialized knowledge the deference it deserves, the factors present in this case do not amount to the level required for reasonable suspicion.

### III. Conclusion

In conclusion, the totality of the circumstances do not support a finding of reasonable suspicion in this case.  As stated in Terry, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences

from those facts, reasonably warrant" the investigatory stop. Terry, 392 U.S. at 21. Here, there was a vehicle stopped which does not match the description transmitted through radio dispatch. Not only is it a different model SUV, it is a different color. No window is shot out. The vehicle which had been seen fleeing the scene at a high rate of speed is found nine minutes later idling at a red light three blocks away. Moreover, the number of passengers does not match. In order to uphold the stop here as reasonable, the number of passengers inside the vehicle must therefore be irrelevant. Such a course permits the police to stop any number of black persons seen riding in any vehicle similar, but not matching in description to the one seen at the crime scene. This is the precise concern stated by Circuit Judge McKee in Kithcart, and in this Court's judgment, a valid one. See Kithcart, 134 F.3d at 533-34 (McKee, J., concurring in part and dissenting in part).

To be sure, there are the separate independent observations of the head turn and handing back of some indescript object. But these observations, coupled with the mis-matches described above, do not give rise to an articulable level of reasonable suspicion necessary for the stop.[7] This Court is well aware that

> the Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief that a crime was about to be committed.

---

[7] Although not directly applicable to the reasonable suspicion calculus, it is worth noting the approach Officer Barrett took once he seized the Tahoe. Officer Barrett approached the Tahoe (suspected of being involved in a recent shoot-out) flashlight in hand, assuming a low-risk posture. (See Gov't Surreply Br., p.47-48.)

See United States v. Carstarphen, No. 07-3237, 2008 WL 4605962, at *5 (3d Cir. October 17, 2008) (citing Johnson v. Campbell, 332 F.3d 199, 207 (3d Cir. 2003)). But this case does not warrant that result. The cases cited by the government to uphold the seizure are simply inapposite to the facts of the present case. Therefore, the firearms seized as evidence must be suppressed as fruit of an unlawful seizure. Accordingly, Defendant Brown's motion to suppress the firearms seized on January 30, 2006 is granted.

/S/ Joseph H. Rodriguez
Joseph H. Rodriguez
U.S.D.J.

October 27, 2008
Date

20